THE BALTIMORE & POTOMAC RAILROAD COMPANY

*vs.*

JAMES B. EDMONDS ET AL., COMMISSIONERS OF THE DISTRICT OF COLUMBIA.

EQUITY.   No. 9262.

{ Decided March 10, 1885.
{ The CHIEF JUSTICE and Justices MAC ARTHUR and JAMES sitting.

The charter of the Baltimore & Potomac Railroad Company (act of Congress of February 5, 1867) authorizes it to take and use for depot purposes with the turnouts necessary to reach it, any lots of ground in the city of Washington contiguous to the line of its road; that is to say, any lots between the front of which and the line of the road no other lots intervene, and for this purpose square 232 is contiguous to the line of the road although by the recess caused by the intersection of several streets, it does not touch Maryland avenue along which the road runs.

STATEMENT OF THE CASE.

This was a bill in equity praying an injunction to restrain the defendants, Commissioners of the District of Columbia, from interfering with its work of laying tracks from its main line of railroad, Maryland avenue in Washington city, to the square of ground owned by it and known as square No. 233.

The allegations of the bill were substantially as follows:

That the company's charter, section 12 of the act of the legislature of Maryland which was re-enacted by act of Congress of February 5, 1867, is as follows:

"That the president and directors of the said company shall be, and they are hereby invested with all the rights and powers necessary to the construction, working, use and repair of a railroad from some suitable point in or near the city of Baltimore, and thence within one mile of the town of Upper Marlboro in Prince George's county, and as near to said town, within the limits of said distance as may be practicable, and by or near the town of Port Tobacco in Charles county to a point on the Potomac river, to be selected by the president and directors of said company hereby incorporated, not higher up than Liverpool Point, and not lower down than the mouth of St. Mary's river, with such

branches at any point of said railroad not excceding twenty miles in length, as the said president and directors may determine. The said road, when completed, not to be more than sixty-six feet wide, except at or near its depots or stations where the width may be made greater, with as many tracks as the president and directors may deem necessary; and the said president and directors may cause to be made, or may contract with others, for making said road or any part of it; and they or their agents, or those with whom they may contract, or their agents, may enter upon and use and excavate any lands which may be wanted for the site of said road or the erection of warehousss or other works necessary for the said road or for its construction and repair, and that they may build bridges, fix scales and weights, lay rails, may take and use earth, gravel, stone, timber or other materials which may be needed for the construction and repair of the said road or any of its works, and may make and construct all works whatever which may be necessary and expedient in order to the proper completion and maintenance of the said road; and they may make or cause to be made lateral railways in any direction whatever from the said railroad, and for the construction, repair and maintenance thereof shall have all the rights and powers hereby given in order to the construction and repair of said principal railroad, and may also own and employ steamboats or other vessels to connect the said railroad or railroads with other points by water communication, provided nothing herein contained shall be construed to authorize the said company to take private property for their use without compensation agreed upon by the company and the owners thereof, or awarded by a jury as hereinafter provided, being first paid or tendered to the party entitled to receive such compensation."

That the said act of Congress of February 5, 1867, authorizes the complainant, in constructing and maintaining its road in this District, to exercise the same powers, rights and privileges as it may exercise under and by intent of the said charter or act of incorporation, in the extension and con-

struction of any railroad within the State of Maryland, and that it shall be entitled to the same rights, compensation, benefits and immunities in the use of the said road, and in regard thereto as are provided in said charter, except the right to construct any lateral road or roads within said District, it being expressly understood that complainant shall have power to construct only one lateral road within the said District to some point or terminus within the city and county of Washington, to be determined in the manner thereinafter mentioned.

That by virtue of the said authority, the complainant constructed its line of railroad, along K street, southeast, and over Virginia avenue and Maryland avenue to and over the "Long Bridge," with various turnouts and sidings as authorized by law, and it constructed depots and warehouses for freight, and other works, at various places in said city, and it now maintains and uses said tracks, sidings, stations and depots, warehouses and works, as by law it has a right to do, for the purpose of conducting its business of transporting freight and passengers by cars and locomotive engines propelled by steam.

That in consequence of the vast increase in the business of the complainant, and the inadequacy of its warehouse and track accommodations for such business, it purchased the square of ground before mentioned for about the sum of $23,000. This square contains nearly one and a half acres of ground, and is especially adapted to and appropriate for the uses and necessities of the company in the proper conduct of its business. It is located in a sparsely inhabited part of the city, and will not incommode private persons; the proposed tracks leading to it will not obstruct the use of the streets to any greater extent than the presence of railroad tracks, skilfully laid, will obstruct any street. The streets in this vicinity are not used for general travel, but principally for the passage of wagons and carts loaded with bricks and other heavy freights passing from Virginia over the "Long Bridge." The contemplated improvement will be a positive benefit to the surrounding property.

That the said square is in the immediate vicinity of the Long Bridge, and is bounded by Water street, D and 14th streets, southwest, and Maryland avenue; the distance from Maryland avenue to the nearest point of the square is about two hundred feet. Water street, at this locality, although appearing as a public street on the plans of the city, has never been opened or improved, nor has it ever been used as a highway or thoroughfare by the public. There are no dwellings or buildings of any kind on the west of said square, it being practically on the bank of the Potomac river, and only one building north of and in immediate or close proximity thereto; and that building is not used for the purpose of a dwelling house, but is, and for a long time has been, used as a depot for stores belonging to the Quartermaster's Department of the Army of the United States. On the east side of 14th street, and between D street and Maryland avenue, there are only about four very small dwelling houses, and the distance between them and the square is so great that they cannot be injured, nor can the occupants thereof be annoyed by any use to which the square may be devoted by the complainant. This tract is one of the most convenient and suitable pieces of ground for the accommodation of the complainant's business and the business interests of the city of Washington which can be found along the line of the railroad.

That the use of the said square, and the contemplated stations, warehouses, and other works to be erected and used thereon, are necessary, proper and expedient in the working of said railroad, and in the proper conduct of its business. Said square was selected and purchased at great expense for the purposes aforesaid, because its location and surrounding advantages made it especially suitable therefor.

That in consequence of the increase of the business of complainant in the city of Washington, and of the great increase in the wants and the supplies of the people, and of the great increase in the commercial business generally of the city of Washington, the other stations and warehouses owned or used by the complainant, have become and are in-

sufficient, both in number and in capacity, to furnish the proper facilities for the management and conduct of the said business.

That in order to reach this property with the least possible obstruction of the public streets, the complainant propose and desire to cross 14th street from its property (square 267) lying immediately east; this, however, is not necessary; the sidings can be laid along Maryland avenue in a curved line, and cross over the open paved space, constituting a part of the public street at this point, and lying between the main track of the company and the square.

That the defendants being advised of the purposes of the complainant, threatened and still threaten to prevent the company from laying any sidings whatever leading from its main tracks into this square, and to use the police force of the city of Washington for that purpose.

The defendants interposed a general demurrer to the bill, and the cause having been set for final hearing and having been argued by counsel, the bill was dismissed with costs. From this decree the complainant appealed.

ENOCH TOTTEN for complainant:

The learned judge, holding the Special Term, was of the opinion that this parcel of land was too remote from the main line of the railroad on Maryland avenue to be within the scope of the statutes comprising the charter of the company. He declared that the complainant clearly had a right to construct and use warehouses, stations and works in this city, necessary for the proper management of its business, immediately along Maryland avenue, and connect them with the main track by sidings. He instanced square 267, to which a siding has been laid and maintained, but he assumed that square 233 did not actually abut upon the building line of Maryland avenue, and that therefore this right did not exist as to that square, and decided that the railroad company had no authority to reach this property by laying tracks either across Fourteenth street or over the street space lying between the main line and the prop-

erty. This, I submit, was a very narrow and strained construction of the statute, and it is unreasonable and erroneous.

It cannot be said, upon any fair construction, that a siding extending from the main tracks on Maryland avenue, on a curved line to this piece of ground, would pass over any part of either Fourteenth or Water streets. But it seems to me wholly immaterial whether we call this street by one name or by another. This intervening ground is adjacent to the street and connects the square with it. But it is submitted to the court, that if it be true that the greater includes the less, such a siding would fall wholly on Maryland avenue. The space lying between the main track and this square is formed by the junction of the three streets at this point, and it may as well be called Maryland avenue as Water street, and it is no more Water street than Fourteenth. If this be not so, then by parity of reasoning the whole space to the width of eighty feet at the head of Long Bridge is Water street, inasmuch as Water street extends along the entire river front. It may also be argued that the company has no right to extend its tracks across this space, thus called Water street, to reach Long Bridge, because no authority can be found in the statutes to cross Water street.

The same reason may be applied against the right of complainant to pass over any transverse street. This is especially so at the junction of C, Seventh, Eighth and Ninth streets, with Maryland and Virginia avenues.

It may as well be said that the company is without right to construct its tracks over the very large space created by the intersection of these streets, as to say that it is without authority to cross the space in front of square 233. This space, at the junction of Maryland and Virginia avenues and C, Seventh, Eighth and Ninth streets, is about 380 feet wide by about 900 feet long.

An inspection of a map showing the various points at which the lettered and numbered streets intersect Virginia and Maryland avenues along the line of this railroad will

show a large number of spaces of irregular shapes and of different sizes, formed by such intersections.

It seems to me that it can be conclusively established, both by reason and authority, that the construction put upon the statutes by the court below was erroneous.  I have carefully examined all the authorities, which a most diligent search enabled me to discover, and in every case, where a similar question was involved, the decision has been in favor of the right of the company to exercise the power here claimed.

It will not be denied by any lawyer at this bar that this space in front of square 233 is a part of a public highway or highways, and that the fee simple title thereto is in the United States.  The United States may dispose of it in such manner and for such uses and purposes as the legislative branch of the government may deem expedient or proper. Van Ness *vs.* City of Washington, 4 Peters, 232.  An ordinary municipal corporation, even where the fee of the street is in the abutting owners, may grant the use of the street for railroad purposes.  Barney *vs.* Keokuk, 104 U. S., 324; S. C., 4 Dillon, 593.

The attention of the court is invited to the following wholesome and advanced doctrines on this subject, declared by the Supreme Court of Pennsylvania:

"The right of the Supreme legislative power to authorize the building of a railroad on a street or other public highway, is not now to be doubted.  It has been settled, not only in England, but in Massachusetts, New York, and in Pennsylvania.  If such conversion of a public street to purposes for which it was not originally designed, does operate severely upon a portion of the people, the injury must be borne for the sake of the greater good which results to the public from the cheap, easy and rapid conveyance of persons and property by railway.  The commerce of a nation must not be stopped or impeded for the convenience of a neighborhood.  But we can say this only in cases where the authority has been given by the sovereign power of the State.  That any private individ-

ual or incorporated company, not empowered to do so by an act of the legislature, can take possession of a street and make a railroad upon it without being guilty of a criminal offence, is a proposition which I am sure no lawyer would ever dream of making. The right of a company, therefore, to build a railroad on the street of a city, depends, like the lawfulness of all its other acts, upon the terms of its charter. Of course, when the power is given in express words, there can be no dispute about it. It may also be given by implication; for instance, if a company be authorized to make a railroad by a straight line between two designated points—this implies the right to run upon, along or across all the streets or roads which lie in the course of such line; so, also, when an act of incorporation directs a road to be made between certain termini, by such route as the grantees of the privilege shall think best, it may be located on an intervening street or other common highway if, in the judgment of the directors, it may be necessary or expedient to do so."

The Court of Appeals of the State of New York,, speaking on a kindred subject, used the following language:

"To make out a case within the statute under which this proceeding is instituted, the land, the acquisition of which is sought, must be 'for the purposes of the incorporation, or for the purpose of running or operating the road' of the petitioner. What may be required in the exercise of this power has been defined by this court in several cases. In re N. Y. & H. R. R. Co. *vs.* Kip, 46 N. Y., 546, it was held that the only limit of the grant of power sought to be exercised under the act, is the reasonable necessity of the corporation, in the discharge of its duty to the public. See, also, In re B. & A. R. R. Co., 53 N. Y., 574, where this principle was endorsed, and it was stated that there must be an evident and apparent absence of all occasion or necessity for the property for the legitimate purposes of the corporation."

In the case of The Tenn. & A. R. R. *vs.* Adams, 3 Head, 597, it was held that whilst railroad companies are to be

confined within the privileges granted by their charters—

"Yet this rule of construction is not to deprive them of the benefit arising from the obvious sense of the charter, and, moreover, whatever is essential to the enjoyment of the thing granted will be, necessarily, implied in the grant."

The court in that case further declared that:

"The power to come within the city of Nashville carries with it, by implication, the power if need be, to locate the road upon a street or alley; for instance, if a company be authorized to make a railroad, by a straight line between two designated points, this implies the right to run upon, along, or across all the streets or roads which lie in the course of such line. So the power to enter the city, of necessity, gives the right to locate the road somewhere, and, if need be, upon a street or alley."

In the case of the Commissioners of Long Branch *vs.* The West End R. R., 29 N. J. Eq., 566, a bill was filed praying an injunction to restrain the defendant company from (amongst other things) laying its tracks on a certain public street, and thereby occupying it to an unnecessary or unreasonable extent.

The court, in its opinion, said:

"It cannot be doubted that the defendants, in the construction of their road, have a right to occupy the highways to the extent of a reasonable' necessity. Such right may arise by implication."

In this case a question was made whether the tracks should pass over the street longitudinally, or at right angles in connection with a curve. The court denied the injunction and left the company at liberty to cross according to its own plan.

In State *vs.* Morris & Essex R. R. 25 N. J. L., 441, it was held that a railroad company might be proceeded against by individuals for obstructing a public street by its depot and its surroundings, and that a railroad company was bound "so to locate the depot that they could receive and discharge freight and passengers without injuriously interfering with the use of the highway by the public."

And see the opinion of Shaw, C. J., in the case of the Inhabitants of Springfield vs. Conn. River R. R. Co. 4 Cush., 70, a case not unlike but much stronger against the claims of the railroad than is this one.

In a case in the Supreme Court of Pennsylvania involving the right of a railroad to construct as a part of its road a turnout or siding connecting its main line with manufacturing or mining establishments, a right far more extensive and important than is claimed here, that court declared the law of that State to be in favor of the right, and said:

"We cannot assent to the opposite contention, which holds that a side track which leads only to a manufacturing or mining establishment, held in private ownership, is illegal, because it does not subserve a public use.   These establishments are very numerous, especially in Pennsylvania, along and near a line of railroad.   They serve to develop the resources of the State, they give employment to vast numbers of citizens, and constitute a most important element in the general wealth and prosperity of the community; convenience and consequent cheapness of transportation, are, in most cases essential, and in many, vital to their maintenance.   Moreover, considerable portions of the general public are directly interested in the traffic which goes to them, and in that which comes from them.

"Hence, in the connection in which we are now considering them, we cannot regard them as merely private interests, and, therefore, without the pale of that public use for which private property may be taken in the construction of railroads lawfully established and actually used for public purposes." Getz' Appeal, 96 Penn. St. See, also, Harvey vs. Thomas, 10 Watts, 63; Sherman vs. Buick, 32 Cal., 241; Brewer vs. Bowman, 9 Ga., 37; Robinson vs. Swope, 12 Bush., 21; Cleveland & P. R. R. Co. vs. Speer, 56 Pa. St., 332; Pittsburg vs. Pa. R. R. Co., 48 Pa. St., 359; Prather vs. Jeffersonville R. R. Co., 52 Ind., 16.

The many tracts of land of peculiar and irregular shapes above referred to, along the line over which this company was permitted to construct and maintain its railroad, must

have been taken into consideration by the legislature when the authority was granted, and they were intended to be utilized for stations, turnouts, &c., &c. There are, along the line of the railroad from the canal to the river, nine of these spaces: at South Capitol street; at Delaware avenue; between 2d and 3d streets; between $4\frac{1}{2}$ and 6th streets; between 6th and 10th streets; at 10th, 11th, 12th and 14th streets.

The spaces created by these various junctions were intended by the act of Congress to be included in the designation of the particular streets which help to form them, and it will not do to segregate a small part of one of these spaces and call it a part of a lettered or numbered street in order to argue that the company has no statutory authority to pass over it. If this can be done, then the company has no lawful right to cross over any of these spaces.

The act of Congress authorising the company to extend its track over the Long Bridge, "and connect with any railroads constructed or that may hereafter be constructed" in Virginia, requires, in peremptory language, that the company "shall give other railroad companies the right to pass over said bridge" on terms. This, of course, involves corresponding increase of track-room, car-yards, and freight-yards.

It seems to be well settled that when a railroad company is authorised to occupy the street of a city for its road, it possesses the right, as a necessary incident, to make a "turnout" within the limits of a street to communicate with its depot (R. R. *vs.* Municipality, 1 La. Ann., 128), and authority to construct a railroad includes, *ex vi termini*, such additional sidings and branches to their depots, wharves, &c., as are made necessary by increase of business. All power to construct and maintain a railroad necessarily includes power to build depots, stations, side-tracks, engine-houses, switches, repair shops, &c., &c. Enfield Toll Bridge Co. *vs.* Hartford & N. H. R. R. Co., 17 Conn., 454; Black *vs.* Phil. & R. R. R. Co., 58 Pa. St., 249; Turnpike Co. *vs.* Camden & Amboy R. R., 2 Harr., N. J., 314; Duncan *vs.* R. R. Co., 94 Pa. St., 435;

Lake Sup. R. R. Co. *rs.* U. S., 93 U. S., 453; Cathron *rs.* R. R. Co., 2 Phillips, 469 (Eng. Ch.); P., W. & B. R. R. Co. *vs.* Williams, 54 Pa. St., 103; Com. *vs.* Haverhill, 7 Allen, 523; Toledo & W. R. R. *vs.* Daniels, 16 Ohio St., 390; N. Y. & H. R. R. *rs.* Kip, 46 N. Y., 546; Protzman *vs.* R. R. Co., 9 Ind., 469; Speer *is.* R. R. Co., 56 Pa. St., 325.

The original charter provides that the company—

" May enter upon and use and excavate any lands which may be wanted for the site of said road or the erection of warehouses or other works necessary for the said road, or for its construction and repair, and that they may build bridges, fix scales and weights, lay rails, may take and use earth, gravel, stone, timber, or other materials which may be needed, for the construction and repair of the said road or any of its works, and may make and construct all works whatever, which may be necessary and expedient in order to the proper completion and maintenance of the said road."

If the company may enter upon and use "any" lands which may be " wanted " for warehouses or other works, why should it not be allowed to enter square 233 ? Is it because the square does not actually touch an imaginary building line of Maryland avenue, if there was no Water street or Fourteenth street here ? If this square could not have been purchased, could it have been condemned under the statute ?

The Supreme Court of Indiana, speaking on this very subject, said :

" At the termini of railroads, depots are necessarily erected ; at these depots the main business of the roads must be discharged; trains of freight and passenger cars and locomotives must be kept in reserve, and must stand while being loaded and unloaded, &c. In short, about a depot, tracks must necessarily be extended on every side for the accommodation of the company and the public in the transaction of business, and companies have the implied powers, under their charters, to make such as are reasonable and necessary; we think an extension of 200 rods of such an important business road as we know that in question to be, was not unreasonable ; lands may be taken for depots, as

68

well as for roads, of which they are a necessary incident." Protzman *vs.* R. R. Co., 9 Ind., 469.

The distance proposed to be traversed here is only 200 feet from the main line. If this is an unreasonable length of side-track, how far may the company go?

The only limitation on the right of the company to be found in the statute as to occupying property, is in the third section of the act of 1867, which prohibits the "entry" by the company on " any lot or square, or upon any part of any lot or square owned by the United States," to locate or construct its road or to "excavate."

Congress authorized the company to acquire and hold property for its depots, stations, &c., and it can hardly be held that there was no legislative intention to permit the company to use them. Some of the authorities have gone a great way in the construction of statutes, in order to allow railroad companies access to the depots, &c. Black River Import. Co. *vs.* La Crosse Co., 54 Wis., 659; State *vs.* R. R. Co., 3 Ind., 421; R. R. Co. *vs.* R. R. Co., 8 C. S. Green, 157; Davis *vs.* R. R. Co., 1 Sneed, 94; U. S. *vs.* Bridge Co., 6 McLean, 517; Rorer on R. R., 489; R. R. Co. *vs.* R. R. Co., 23 N. J. Eq., 157; Hughes *vs.* R. R. Co., 18 Fed. R., 106; U. P. R. R. Co. *vs.* Hall, 91 U. S., 346–354; R. R. Co. *vs.* Gas Light Co., 63 N. Y., 326; Chi. & W. R. R. Co. *vs.* Dunbar, 100 Ill., 110; Houston & Texas R. R. *vs.* Odum, 2 Am. and Eng. R. R. Cases, 3 Texas 503; Rio Grande R. R. Co. *vs.* Brownsville, 45 Texas, 88; 10 John., 388; 52 Ga., 245.

The power of determining whether or not depots and stations are necessary and expedient, and where they shall be erected, is by the statute confided to the president and board of directors of the company, and when they have once exercised that power in good faith, their judgment is not reviewable, but is conclusive on all authority in this District, except that of Congress. Ford *vs.* Ch. & N. W. R. Co., Wis., 663; N. Y. H. R. Co. *vs.* Hip, 46 N. Y., 546; Giesy *vs.* R. R. Co., 4 Ohio St., 308; Brainard *vs.* Clapp, 10 Cush., 6; Curtis *vs.* R. R. Co., 14 Allen, 55; Pierce on Railways, 148, 160, 494; Hawley *vs.* Steele, 6 Ch. Div., 521; See Speed *vs.* U. S., 8 Wall., 83.

If the company cannot secure the use of grounds within the limits of the city and adjacent to its line of tract necessary for warehouses, depots, stations, how can it accomplish the object for which it was ordained ? It may as well be excluded wholly from the city.

The act of Congress of June 21, 1870, authorizing the company to extend its railroad along Maryland avenue and on and over the Long Bridge, require the company to repair the old bridge then existing, and to " erect and maintain the drawbridges so as not to impair the free navigation of the Potomac River, and in efficient working condition at all times." It also required the company, in order to accommodate travel and traffic until the needful changes in the bridge should be made, to repair all damages to the (then) present bridge, and maintain it. The act also requires the company to accord to other railroad companies the right to pass over the bridge. The company having complied with these requirements, stands in the attitude of a purchaser for an adequate consideration, and is entitled to a liberal construction of the statute, and to an unembarrassed use of its privileges. Southern R. R. Co. *vs.* Screven, 45 Ga., 613 ; Turnpike Co. *vs.* State, 94 U. S., 63.

It is therefore submitted, that the decree of the Special Term should be reversed, and that the injunction as prayed should be ordered.

A. G. RIDDLE for defendant:

This whole matter may be summarized under two general heads :

I. Has the railroad company the right to construct a track from its main stem to its property—square 233—across Fourteenth street ?

II. Have the Commissioners of the District of Columbia a right to prevent such action by the plaintiff ?

To a correct apprehension of these questions, two other things are necessary to be first considered :

First. As to the *locus.*

To cross, as proposed, is to traverse Fourteenth street directly.

To enter square 233 by side tracks, as suggested, is to traverse a space—parts of Fourteenth, Water and E streets and Maryland avenue—in common. This is not involved in the case, however.

For the law protecting open spaces—public streets—from use by any private person for any purpose whatever, see Sec. 222, Rev. Stats. D. C., pp. 25, 26.

Section 224 prohibits the use of streets by street railroads without express authority from Congress.

Section 226 requires all obstructions of every kind to be removed from all streets, avenues and sidewalks improved by aid from the United States, as these streets were.

Section 227 requires suits to be instituted against all parties so obstructing streets, avenues and sidewalks.

Section 229 denounces a penalty against any person obstructing such street, avenue or sidewalk.

Such is the *locus* and such the law protecting it.

Second. What are the duties and powers of the appellant Commissioners in the premises?

Section 77, Rev. Stats. D. C., places all streets, avenues, sidewalks, alleys and sewers within the entire control of the Board of Public Works, created by the act of February 21, 1871.

Acts of June 20, 1874 (18 Stats., 116), and of June 11, 1878 (20 Stats., 102), confer these powers and duties upon the present Commissioners.

I. Now, how fares the first of our two propositions.

The land dedicated to the public as a street confers upon the public a paramount right, over and above all others, to which even the sovereign can dedicate it.

Congress can lay upon it an additional servitude subordinate to this paramount right of the public.

Whoever claims that Congress has laid upon it this additional burden in derogation of the public right, must show it by unequivocal grant, express or implied. No one questions these propositions.

Congress granted to the plaintiff the right to lay its tracks along Maryland avenue to and over the Long Bridge. This

brings the plaintiff within 200 feet of the nearest point of square 233. That is to say, Congress came within 200 feet of authorizing the plaintiff to lay a track to square 233.

And the plaintiff comes within a little over 12 rods of making a case for an injunction—stating the case with rude succinctness.

II. As to the second—

The plaintiff gave formal notice that he would appear at the point indicated and lay its track across Fourteenth street at the named time.

*a.* It had no shadow of a right to do so.

*b.* It was a punishable offence to do it.

*c.* The *locus* was specially within the power of the Commissioners, under authority of the United States, whose duty it was to prevent the threatened invasion of it by the railroad company. And they did; will continue to do so, unless restrained by the court, or until Congress grants a license to the plaintiff to lay its track as proposed.

The claim of the appellee is, that the right to enter and traverse a portion of the city gives it by necessary implication a right to acquire property convenient for warehouses and depots in the city, and construct the necessary tracks to them and across a street for this purpose, if necessary.

*a.* To this it is urged that, to indulge this implication, it is necessary to cross a public street which express statute law has dedicated to a paramount public purpose, which this implication cannot repeal, overcome or modify. An implied grant of this character cannot prevail against an express grant.

*b.* That in no event could this implied right to cross a street be allowed, except upon the clearly shown right to establish warehouses and depots in the city, and that no other site for them than that proposed can be found.

The bill makes no such case of necessity.

Mr. Chief Justice CARTTER delivered the opinion of the court.

In the case of the Baltimore & Potomac Railroad Com-

pany against James B. Edmonds, Joseph R. West and Garrett J. Lydecker, Commissioners of the District of Columbia, we have a bill in chancery instituted by the complainant against the defendants for obstructing the exercise of their rights as a corporation in building a railroad track to square No. 233, ground which the bill avers the company has purchased for the purpose of the convenience and necessities of the railroad "for warehouse and other purposes."

It is claimed by the bill that the complainants are authorized by legislative power to do this thing; that they had a sovereign grant of Congress to this end.   On the other hand it is claimed by the respondents, that the exercise of this assumed right is an invasion of the dedicated rights of· the public to the streets of the city of Washington, and that the respondents, as guardians of the public rights of the citizens of Washington, were in duty charged with preventing it, as they have thus far done.·   Over this question of power arise the issues of this case, and it is a very serious case too.   It is·a grave case in the exercise of the political sovereignty of the District.   It is a grave case when considered in the light of the construction of the corporate power of this corporation.   And what renders the case graver, is the serious attitude that has been assumed with reference to it.   A corporation has attempted to exercise its corporate rights, and the municipal authority has arrested it by the intervention of the police force.   This is what the bill complains of.

It is not a contested question that Congress has the sovereign power to dispose of this matter as it will, under the Constitution of the United States.   As the municipal authority of this District, under the Constitution, it had the power to permit the advent of this railroad into this District for commercial purposes.   In exercising its municipal sovereignty over the District in the light of the same constitutional authority, they had the power to ordain a political sovereignty here in guardianship of the streets.   The whole subject was within the control of the law making power, and over that question no issue is taken in the argu-

ment of the case.   1t is not a question of the existence of
the power, but of its exercise, and the limitations of the ex-
ercise of that power.   The complainant in this case starts
out with the proposition that they have a plenary right to
do just what they are doing.

Entering into the act of incorporation of the road by au-
thority of Maryland, and repeated again in the authority
given it by Congress to enter this District, we are pointed
to this language as vindicative of the plenary power confer-
red upon this corporation for commercial purposes:

"The said road when completed not to be more than sixty-
six feet wide, except at or near its depots or stations, where
the width may be made greater, with as may tracks as the
president and directors may deem necessary."

It is claimed on the one hand that here is a plenary grant
to make this road at least sixty-six feet wide for commercial
purposes.   It is claimed on the other hand that this grant
is qualified by the fact that it contemplated the rural ex-
istence of the road, and not its city existence.   But the
language is re-enacted by Congress in the terms they found
it, and as far as it is capable of application to the condition
of the District, it is the text of authority to the end for
which it was designed.

Again, the court is pointed to the further language:

"And they or their agents, or those with whom they may
contract as their agents, may enter upon and use and ex-
cavate any lands which may be wanted for the site of said
road or the erection of warehouses or other works necessary
for the said road or for its construction and repair."

It is said that here is the plenary grant not only to enter
the District with the road, but to erect any works essential
to the prosperity and purposes of the corporation.   And it
is very difficult to conceive how broader language could be
used—more ample phraseology to an end.

Here was a railroad running into the capital of the nation
for its convenience and for the convenience of the public
who might seek this centre of political power.   Congress
had seen fit to grant an act of incorporation for this purpose,

and evidently they intended it should answer the purpose for which it was designed, a public convenience, and provided that they might erect any works essential to the operation of the road.

How language more ample, more significant and comprehensive can be used than they have used here, it is difficult to imagine. It is as ample as the necessities of the subject. It is as ample as the reasonable conveniences of the subject. It is as ample as the commercial demands of this centre, through the agency of this road, could require. And we do not know that this proposition is controverted as an abstract proposition, for we have not met the subject of chief difficulty.

Again, we are pointed by the complainants to another passage in the act manifesting the same intention on the part of the law-makers:

"And may make and construct all works whatsoever, which may be necessary and expedient in order to the proper completion and maintenance of said road."

Now, inasmuch as "all" embraces the constituents of all, inasmuch as the larger embraces the lesser, and inasmuch as you cannot contemplate anything that is not covered by "all," it is claimed by the complainant in this case that they have the power to make "all" the necessary roads. A more plenary grant never was issued to a corporation. The corporation would have been empowered to do this without this phraseology, if it had not been named at all; if Congress had not taken the special pains to enumerate that they should construct "any and all works necessary" to this road, the law would imply it. The law creating a corporation with commercial powers and purposes, and revealing the commercial powers and purposes of its creation in the terms of its creation, carries with it all the implications that follow that grant, and there is no principle in the construction of corporate power better settled than that the clear expression of power brings with it all implications that are embraced in it. Even without this phraseology, the power of the corporation would have been complete to do this, and we

do not know that this is seriously controverted by the defendants; we have not heard it seriously controverted. We have not met the point at issue, yet, in this case. These considerations are considerations of authority and power that the complainants have tendered to the deliberation of the court as covering what they did. And the argument in response is, not that they have not this power, nor that this commercial grant does not carry with it all of the authority essential to its practical execution; but it is insisted that they are departing from it, going away from it, and beyond the grant of power, and seeking for their license outside of authority, and therein are invading the guardianship permitted to the Commissioners of the District over the highways of the District. There lies the point.

The language of the defence is practically this: You may come into the District of Columbia as Congress has authorized you to do. You may cross all the streets, from one to twenty-one, in traversing the District from one border to the other, doing no unnecessary damages, and interposing no unnecessary obstacle in doing it. You may do all that. But you shall not cross a street or depart from the line of your transit to build a depot, or to build a warehouse or a workshop, or a locomotive stable. You shall not command authority to cross a street for any of these purposes.

Now, it is not necessary for the court here to adjudge that the power exists to cross a street for the determination of this case, for here we have a mere proposition to leave the avenue and pass over a highway, or a country dedicated to a highway, and to the first ground to be found of a private character. Within the track of the railroad, within the limitations of the street upon which the track of the railroad traverses, and without it, and within the border of the square that is proposed to be occupied, there is none but highway.

There is that undefined, ideal line between Water street and Maryland avenue, that is ascertained by the projection of Maryland avenue, or the line of Maryland avenue, or emptying out of Maryland avenue into Water street, whichever you please; it is "street" all the while, and it is the

street that would answer to the integrity of their action in the light of seeking contiguous property for corporation purposes. It is contiguous; for it is the nearest property in approach to the line of Maryland avenue that you can find, and you go over no other property to reach it.

Our streets are peculiar, as the geography of the city demonstrates. We are furnished with right-angled highways, right-line highways, and we are furnished with oblique and acute angles; we are furnished with spaces, and we are furnished with that undefined marriage of highways with each other, and you cannot tell where the ceremony transpired, except by an imaginary line; and upon the border of this enlargement lies square 233, and this company is charged with the offence of overleaping the boundaries of corporation authority in taking the first land that they can reach over a highway.

It is perfectly obvious that in the sense and substantial intendment of Congress, even if they were confined to contiguous property for the display of depot or warehouse work, they have substantially complied with it in this instance. For it is the substance of the thing that the law is pursuing, and not its shadows. This corporation was incorporated for practical commercial work. These highways were pointed out in the correlation of that work, and if they cannot approach the site of highways where they mingle with each other to get to land, or to get to private land, you have practically defeated the purposes of the act of incorporation; and we think if the doctrine of contiguous territory obtain, as in the instance of this bill, this company has practically and fairly observed it in seeking block 233 through Water street, if that is the name of it, to its border.

But that does not satisfy my conclusion about the authority granted by this act of incorporation, individually. I only speak for myself in this. Here is an express provision in the original charter, re-enacted into the extending of the road into this District, and re-enacted again in extending the road through this District, that the corporators may cross the public highways of the District.

Now, is it rendered, in the restricted sense, a right to cross it in the transit of the main line?

Not at all. The right to cross the highways is a right coextensive with the legitimate necessities of the corporation, whether those necessities are manifested in the movements of a locomotive upon the line of transit, or manifested in its reaching out its short arms to warehouses, to locomotive stables, and to depots. They are as much identified with and coherent in the structure of the railroad as the main line, and all the phraseology applicable to the *termini* that is pronounced upon the main line, is applicable all the way through. You cannot distinguish in the power. If one block is not large enough to accommodate the depot conveniences or necessities of a road, the same authority that permits them to cross a street in the transit of a road, permits them to cross a street in seeking another block most convenient to the one that they occupy, for the purpose of perfecting the conveniences and necessities of the road. And why not? Legislation is an intelligent exercise of power, working to a purpose. In this instance it is an exercise of power working to the purpose of accommodating this District with commercial easements in bringing the people and their products to it, and taking the people away from it, and it has not discharged its functions until it does it, and it cannot discharge its functions properly until it is equipped with all the appointments necessary to do it, and the appointments occupying these squares are just as necessary as anything else.

But it is said they may wander all over your city, if that be the case. No, it does not follow at all that they may. There is no such vagrancy encouraged by the theory at all. They can follow just as far as the necessity, the reasonable necessity of the subject requires, and therein is interposed the guardianship of the courts. The courts, under all the authorities that have been presented, are invoked at this point to ascertain whether they are following vagrant ways, or whether they are legitimately enacting the functions of their authority, and there is where the whole matter rests;

there is where the whole matter rests in this case. Is this a reasonable appropriation of corporate power to the end of commercial necessity? And it is the only question, in my judgment, that appeals to the power of the court. It is not a question of squares; it is not a question of streets. It is a question of propriety in the squares and propriety in the streets. But these are my individual views of the subject, and I do not wish to charge them over to the account of the court; especially as the other proposition is ample to cover the ground that the court has unanimously taken.

This court, from time to time, has been called upon, in administering the fate of this road judicially, to clean out the streets from one end of them to the other. It has told this company that they should not stop in the streets. It has said: "You shall not unload your freight here; you shall not load it; you shall not make a stable of this street for your locomotives or your cars; or let out offensive stock to stand here." The court has cleaned up this Maryland avenue from one end to the other, by decree and judgment, until this corporation is pretty much ruled out of these streets, except for transit. They can move through them, but they cannot stop on them for freight or depot purposes. Well, we have got them out of the street, and now what happens? The guardians of this road come into court and tell us that they are not permitted to go anywhere else.

What is the effect of all this, except to repeal the act of incorporation which created the company? "You cannot do anything in this street; you cannot do anything out of the street, because you cross a street, or because you cross 200 feet of undefined street occupied for nothing else." The result of it would be, as is perfectly obvious to everybody, to cripple and defeat the objects of the corporation, and to defeat the ends of public interest, as well as to defeat the ends of Congressional purpose, if it is carried out.

Why, it is said, they can go somewhere else. Well, it does not appear in this case that they can. All the testimony before us in this case is to the effect that square 233 is eminently the proper place for it. Even counsel say that

if authority will permit them to pass a street, they cannot be stowed away any better that they know of than on square 233; and anybody who looks at the geography of the locality will see that it is pre-eminently the proper place, because it is right on the skirt of population—beyond it is a marsh which has been inhabited for seventy years by nothing but toads. It is a common dumping ground. It is a swamp. And if there is any place inoffensive to public taste, it seems to us that they have found it here. There is no neighborhood to be discommoded by it. A large body of substantial business men, reflecting the commercial interests of the District, by testimony, say that this is eminently the proper place to put this road into stable, and hope that the Com-. missioners will permit it to be done.

These views, generally expressed, have operated with the court to grant the injunction prayed for in this bill, and to permit this company to go on its way.

Mr. Justice JAMES said:

The question is simply one of construction of the charter. Congress has said that the tract shall not be wider than sixty-six feet, except at the depots and stations, and has provided for taking land necessary for the purposes of the road. The implication is that the depot grounds are to be along the line prescribed. In applying this to the peculiar plan of Washington, I have arrived at the conclusion that the company is authorized to take and use for depot purposes, any lots between the front of which and the line of the road no other lots intervene. For the purposes of this act such lots may be said to front upon and lie along the road. This would give authority to use as depot grounds, with the turnouts necessary to reach it, a lot which fronts, as the lot in question does, towards Maryland avenue, although, by the recess caused by the intersection of several streets, it does not touch that avenue. It is unnecessary to consider in this case complainant's argument that the charter authorises it to take, and construct approaches to, even a second tier of lots, not fronting in any sense on Maryland avenue, in case they should be necessary.

MR. RIDDLE said: I will take leave to answer this bill, as you simply overrule my demurrer. I have some very grave questions which I wish to present to this court before the matter is finally disposed of.

After a short discussion between Mr. Riddle and Mr. Totten, the Chief Justice said:

THE CHIEF JUSTICE. We would rather the motion should be reduced to writing, with the reasons for it, and if those reasons are a new discovery of facts, or a contradiction of facts, we will advise concerning it. But the law cannot be reviewed again here. This decision is final, so far as this court is concerned, with reference to the law of the case.